## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

----------------------------------------------------X

JIM C. DO, individually and on behalf of all    :    Case No.
others similarly situated,      :

        Plaintiff,     :

            :      **CLASS ACTION**
       v.        :       **COMPLAINT**
            :      **FOR VIOLATIONS**
BROOKTROUT, INC., ERIC R. GILER,   :      **OF FEDERAL**
   ROBERT C. LEAHY AND      :      **SECURITIES LAW**
   STEPHEN IDE,        :

            :      **JURY TRIAL DEMANDED**
        Defendants.     :
----------------------------------------------------X

**00 - 12132**

### NATURE OF THE ACTION

1. Plaintiff brings this action as a class action on behalf of himself and all other persons or entities who purchased the common stock of Brooktrout, Inc. ("Brooktrout" or the Company) during the period February 3, 2000 through and including October 6, 2000 (the "Class Period"), to recover damages caused by defendants' violation of the federal securities laws. During the Class Period, defendants issued to the investing public false and misleading financial statements and press releases concerning Brooktrout's publicly reported revenues and earnings.

2. On October 6, 2000, Interspeed, Inc., a majority owned subsidiary controlled by Brooktrout, issued a press release announcing that "information has come to the attention of management that certain revenue may have been recognized incorrectly in the Company's unaudited quarterly financial statements for each of the prior quarters of fiscal year 2000. Accordingly, [Interspeed] anticipates that its unaudited results for the interim periods will be restated. The amounts of such revenue adjustments are currently being determined." In this

DOCKETED

press release, the Company also announced the termination of Arther A. Goodwin, Interspeed's senior vice president of world wide sales, and Christopher Whalen, vice president of sales.

3. As a majority owned subsidiary, Interspeed's financial results were consolidated into Brooktrout's financial results.

4. The market reaction to the announcement was swift and severe. The price of Brooktrout common stock plunged as much as 25.66% after the Interspeed announcement, falling from a closing price of $28 1/4 per share on October 6, 2000 to as low as $21 per share in trading on October 9, 2000 and closing at $22 7/64 per share that day. Further, during the Class Period, Brooktrout stock traded as high at $50 3/4 per share, representing a drop of more than half.

## JURISDICTION AND VENUE

5. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

6. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1333.

7. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements at issue, occurred in substantial part in this District. Brooktrout has its principal place of business in this District.

8. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

9.  Plaintiff Jim C. Do purchased shares of Brooktrout common stock as set forth on the certification form attached hereto and suffered damages as a result.

10.  Defendant Brooktrout, Inc. maintains its principal executive offices at 250 First Avenue, Needham, Massachusetts 02494.   Brooktrout supplies electronic communications products. The Company, through its subsidiaries and divisions, provides high performance products that enable businesses and consumers to exchange information electronically.  Products include multi-channel fax, data, and voice boards, CTI solution services, rapid application development tools, fax and voice systems, modems, and xDSL systems.  Brooktrout owns 6.075 million shares of Interspeed Inc. (55.43% of the outstanding shares).

11.  Brooktrout controls Interspeed's board of directors.  During the Class Period, of the five members on Interspeed's board, three were Brooktrout directors and officers, including Brooktrout's President, Defendants Eric R. Giler, and its Senior Vice President, Defendant Stephen Ide, who, as alleged below, was also the President and Chief Executive Officer of Interspeed.  Brooktrout is also a major creditor and business partner of Interspeed.

12.  Defendant Eric R. Giler ("Giler") was the Company's President and Director throughout the Class Period, as well as its Principal Executive Officer.  Defendant Giler made materially false and misleading statements in the Company's press releases announcing the Company's financial results for the fourth quarter and full year of fiscal 1999 and first and second quarters of fiscal 2000.  Defendant Giler also signed the false and misleading Annual Report on Form 10-K for fiscal 1999 and Quarterly Reports on Form 10-Q for the first and second quarters of fiscal year 2000.

13.   During the Class Period, Defendant Stephen Ide ("Ide") was a Senior Vice President of Brooktrout.   He was also Interspeed's President and Chief Executive Officer throughout the Class Period until his resignation announced on October 6, 2000.   Defendant Ide is a named defendant in securities class actions filed against Interspeed, Brooktrout and certain other defendants, also pending before this Court, and allegedly made materially false and misleading statements in the Interspeed's press releases announcing Interspeed's financial results for the first, second and third quarters of fiscal year 2000.

14.   Defendant Robert C. Leahy ("Leahy") was the Company's Vice President of Finance and Operations and Treasurer throughout the Class Period, as well as its Principal Financial and Accounting Officer.   Defendant Leahy signed the false and misleading Annual Report on Form 10-K for fiscal 1999 and Quarterly Reports on Form 10-Q for the first and second quarters of fiscal year 2000.

15.   Defendants Giler, Leahy and Ide (the "Individual Defendants"), as officers and/or directors of the Company are controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.   By reason of their positions with the Company and with Interspeed, they were able to and did, directly or indirectly, in whole or in material part, control the content of public statements issued by or on behalf of the Company.   They participated in and approved the issuance of such statements made throughout the Class Period, including the materially false and misleading statements identified herein.

16.   By reason of their positions with the Company, the Individual Defendants had access to internal Company and Interspeed documents, reports and other information, including the adverse non-public information concerning the Company's services, financial condition, and

future prospects, and attended management and/or board of directors meetings.  As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

17.   Brooktrout and the Individual Defendants as officers and directors of a publicly-held company, had a duty to promptly disseminate truthful and accurate information with respect to Brooktrout and to promptly correct any public statements issued by or on behalf of the Company which had become false or misleading.

18.   Each of the defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated.  Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

19.   The Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

20.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Brooktrout common stock during the period from February 3, 2000 through October 6, 2000 inclusive (the "Class Period"), and who suffered damages thereby.  Excluded are the defendants, members of the Individual Defendants' families, any entity in which any defendant has a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and

assigns of any of the defendants (the "Class").

21. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, thousands of members of the Class who traded during the Class Period. The Company had in excess of 12.247 million shares of its common stock outstanding as of August 1, 2000.

22. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.    whether Brooktrout issued false and misleading financial statements during the Class Period;

    c.    whether the Individual Defendants caused Brooktrout to issue false and misleading financial statements during the Class Period;

    d.    whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    e.    whether the market prices of Brooktrout securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

    f.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

23. Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

24. Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

25. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  the omissions and misrepresentations were material;

c.  the securities of the Company traded in an efficient market;

d.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.  plaintiff and members of the Class purchased their Brooktrout stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

27. Based upon the following, plaintiff and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

7

## BACKGROUND

28.  On September 24, 1999, pursuant to a registration statement and prospectus filed with the Securities and Exchange Commission ("SEC") and made effective that date, Brooktrout sold to the public 3.5 million shares of its wholly owned subsidiary, Interspeed, Inc. ("Interspeed") for $12 per share, while retaining approximately 57% of Interspeed, thereby leaving Brooktrout with control of Interspeed.

29.  According to its press releases, Interspeed designs, develops and markets advanced high-speed data communications solutions based on digital subscriber line (DSL) technology.  Further, it purports to offer a highly scalable family of DSL Access Routers – the Interspeed 1000, Interspeed 500, and Interspeed DART.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

30.  On February 3, 2000, Brooktrout issued a press release over the PRNewswire reporting its financial results for the fourth quarter of fiscal year 1999.  The press release stated in relevant part:

> Consolidated revenue (including non-core activity) for the fourth quarter of 1999 was $40,330,000 as compare to $25,325,000 for the fourth quarter of 1998.  Consolidated net income for the fourth quarter of 1999 was $7,015,000 or $0.61 per share compared to a net loss (including acquisition related charges) of $333,000 or $0.03 per share for the comparable period in 1998.

> \* \* \*

> "We are very pleased with our 1999 results and with our continued leadership position in the industry," said Eric Giler, president of Brooktrout, Inc.  "Our business displayed revenue growth and profitability, as well as a return on investments, which enabled us to make several additional investments this past year in our technology, product offerings and new businesses.  We are very excited about our prospects for 2000 and our core business.

We continue to enhance our position in serving new markets for emerging applications such as voice over DSL, Voice over IP, Unified Messaging, and Wire/Wireless, all of which are part of which we are calling the New Network."

\* \* \*

In non-core activities in connection with the initial public offering of Brooktrout's subsidiary, Interspeed, Inc. (Nasdaq: ISPD), during the fourth quarter the underwriters exercised their over-allotment rights to purchase an additional 425,000 shares of Interspeed, Inc. common stock from Brooktrout, Inc. As a result, Brooktrout recognized a pre-tax gain, net of expenses, of approximately $3.8 million in connection with the exercise of the over-allotment. Brooktrout currently owns approximately 6.1 million shares of Interspeed's common stock, or approximately 57% of the shares outstanding, with a current market value of approximately $124 million based on the closing price of ISPD on NASDAQ on February 1, 2000.

31. Also on February 3, 2000, Interspeed issued a press release reporting its financial results for the first quarter of its fiscal year 2000. The press release stated in relevant part:

Revenues for the first quarter ended December 31, 1999 were $3,152,000, an increase of $3,088,000, over revenues of $64,000 for the first quarter of fiscal year 1999. Revenue increased $2,515,000, or 395 percent, from the fourth quarter of fiscal year 1999. Of the $3,152,000 first quarter 2000 revenues, 94 percent of the revenues were from shipments of domestic customers and 6 percent to international customers.

Net loss was $2,546,000, or $0.24 per basic and diluted share, for the first quarter of fiscal year 2000, compared to a net loss of $1,623,000, or a loss of $0.20 per basic and diluted share, for the first quarter of fiscal year 1999. Pro forma net loss for the first quarter of fiscal year 2000, excluding non-cash stock compensation expense, was $2,129,000, or $0.20 per basic and diluted share.

'We are very please with the revenue growth that Interspeed achieved in this past quarter,' said [Ide]. 'Strong acceptance

from serve providers for Interspeed's family of DSL Access Routers – the industry's only fully integrated DSL access platforms – enabled Interspeed to deliver significant revenue growth during the first quarter of fiscal year 2000. During this quarter, Interspeed began deployments with our distribution partners, while continuing to expand our direct sales channel. We believe these efforts, combined with increased investments in sales and marketing, are positioning Interspeed for continued growth.'

32. The financial information released on February 3, 2000 by Interspeed was incorporated in Interspeed's Form 10-Q for the quarter ended December 31, 1999, filed with the SEC on or about February 14, 2000. The Form 10-Q also contained the following representation:

In the opinion of management, the accompanying unaudited condensed financial statements have been prepared on the same basis as the audited financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim periods presented.

33. The financial information released on February 3, 2000 by Brooktrout and Interspeed was incorporated in Brooktrout's Form 10-K for the quarter ended December 31, 1999, filed with the SEC on or about March 30, 2000. The Form 10-K was signed by defendants Giler and Leahy.

34. On April 18, 2000, Brooktrout issued a press release over the PRNewswire reporting its financial results for the second quarter of 2000. The release reported, in relevant part, the following:

Consolidated revenue (including non-core activity) for the first quarter of 2000 was $39,119,000 as compared to $32,218,000 for the first quarter of 1999. Consolidated net income, including non-core activity, for the first quarter of 2000 was $955,000 or $0.08 per share, compared to net income, including non-core activity, or $1,584,000, or $0.14 per share, for the comparable

10

period in 1999.

"We are very pleased with the results of the first quarter of 2000 as our New Network (TM) business grew approximately 82% when compared with the corresponding quarter last year," said Eric Giler, president of Brooktrout, Inc. "In addition, the New Network (TM) experienced quarterly sequential growth, and we believe continues to show exciting growth opportunities as reflected by our financial results."

35. Also on April 18, 2000, Interspeed issued a press release reporting its financial results for the second quarter of 2000. The release reported, in relevant part, the following:

Gross revenue for its second quarter ended March 31, 2000 was $4,003,000, compared to revenue of $327,000 for the second quarter of fiscal year 1999 and an increase of $851,000, or 27 percent, from the first quarter ended December 31, 1999. Pro forma net loss for the second quarter of fiscal year 200, excluding aggregate non-cash stock – and warrant-related charges of $1,574,000, was $2,278,000, or $0.21 per basic and diluted share.

'To effectively and efficiently expand our market presence, Interspeed is working to create an extensive global reseller network,' said [Ide]. 'This was evidenced during the second quarter of fiscal 2000 by record revenue and $32 million in customer agreements. We look forward to continued success as Interspeed further broadens both its direct sales force and adds indirect distribution.'

36. The financial information released on April 18, 2000 was incorporated in Interspeed's Form 10-Q for the quarter ended March 31, 2000, filed with the SEC on or about May 15, 2000. The Form 10-Q was signed by defendant Ide. The Form 10-Q also stated:

In the opinion of management, the accompanying unaudited condensed financial statements have been prepared on the same basis as the audited financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim periods presented.

37.  The financial information released on April 18, 2000 was incorporated in Brooktrout's Form 10-Q for the quarter ended March 31, 2000, filed with the SEC on or about May 12, 2000. The Form 10-Q was signed by defendants Giler and Leahy.  The Form 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission regarding interim financial reporting. They should be read in conjunction with the audited consolidated financial statements included in the Company's 1999 Annual Report on Form 10-K.
>
> In the opinion of management, the accompanying unaudited condensed consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim periods presented.

38.  On July 20, 2000, Brooktrout issued a press release over the PRNewswire reporting its financial results for the third quarter 2000 ended June 30, 2000.  The release reported, in relevant part, the following:

> Consolidated revenue (including non-core activity) for the second quarter of 2000 was $47,203,000 as compared to $33,791,000 for the second quarter of 1999.  Consolidated net income for the second quarter of 2000 was $2,895,000, or $0.23 per share, compared to a net loss due to non-core activity of $109,000, or $0.01 per share, for the second quarter of 1999.
>
> Consolidated revenue (including non-core activity) for the six months ended June 30, 2000 increased to $86,322,000 compared to $66,009,000 for the same period in 1999. Consolidated net income (including non-core activity) for the six months ended June 30, 2000 was $3,850,000, or $0.30 per share, compared with net income of $1,475,000, or $0.13 per share, for the comparable period in 1999.
>
> "We are very excited with the second quarter during which

results of our core business earnings per share exceeded the range of estimates from Wall Street," said Eric Giler, president of Brooktrout. "During the second quarter Brooktrout closed external financing on its subsidiary Beacon Networks, continuing to execute on our investment strategy - investing in several businesses and technologies that play an important role in building the New Network, but which are outside our core business."

39.   On July 20, 2000, Interspeed issued a press release reporting its financial results for the third quarter 2000 ended June 30, 2000.  The release reported, in relevant part, the following:

[Interspeed] reported sharply higher revenue and reduced losses for the fiscal third quarter ended June 30, 2000.  Both revenue and operating results for the quarter exceeded analysts' expectations.

The company, a leading supplier of digital subscriber line (DSL) access routers that enable high-speed networking over copper telephone lines, announced gross revenue for the third quarter ended June 30, 2000 of $7,007,000, compared to $950,000 for the third quarter of fiscal 1999, and a substantial increase from the revenue reported in the previous quarter this year.

Pro forma net loss for the fiscal year 2000 third quarter, excluding aggregate non-cash stock-related charges of $285,000 was $1,897,000, or $0.17 per basic and diluted share, compared to pro forma net loss of $1,875,000, or $0.23 per share, in the third quarter of the prior fiscal year.  Net loss for the three months ended June 30, 2000 was $2,182,000, or $0.20 per basic and diluted share, compared to a net loss of $3,725,000, or $0.47 per basic and diluted share, for the same period a year ago.

\*          \*          \*

'The quarter ended June 30, 2000 was perhaps the most important in the company's brief history.  We signed a number of third-party partner agreements as part of our newly launched SolutionXpert partners program to drive the delivery of total product solutions for our customers; such solutions are essential for success in a fast-paced, high-demand market.  We booked, built and shipped our largest order, one that validates the high-

13

> performance access router technology we are pursuing. We learned to expedite many aspects of the sales, installation and turnover processes that can otherwise slow a company's momentum. Our international business in this quarter was unusually strong. The value of DSL technology in transforming simple telephone lines into high-speed communications channels for all users, quickly and easily, is becoming apparent in both the U.S. and international mass markets. We believe Interspeed is well-positioned for continued sold performance,' [Ide] commented.

40. The financial information released on July 20, 2000 was incorporated in Interspeed's Form 10-Q for the quarter ended June 30, 2000, filed with the SEC on or about August 7, 2000. Defendants Ide signed the Form 10-Q. In addition, the Form 10-Q stated:

> In the opinion of management, the accompanying unaudited condensed financial statements have been prepared on the same basis as the audited financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim periods presented.

41. The financial information released on July 20, 2000 was incorporated in Brooktrout's Form 10-Q for the quarter ended June 30, 2000, filed with the SEC on or about August 11, 2000. Defendants Giler and Leahy signed the Form 10-Q. In addition, the Form 10-Q stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission regarding interim financial reporting. They should be read in conjunction with the audited consolidated financial statements included in the Company's 1999 Annual Report on Form 10-K.
>
> In the opinion of management, the accompanying unaudited condensed consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim periods

14

presented.

42.  The financial statements and related press releases by both Interspeed and
Brooktrout identified above were materially false and misleading when made because, as the
Company's majority owned subsidiary, Interspeed announced on October 6, 2000, Interspeed
will restate its financial statements for the first three quarters of 2000 as a result of the discovery
of improperly recorded revenue.  Throughout the Class Period, Brooktrout reported artificially
inflated revenues and earnings by recognizing revenue in violation of Generally Accepted
Accounting Principles ("GAAP").

43.  The SEC requires that publicly-traded companies present their financial
statements in accordance with GAAP.  17 C.F.R. § 210.4-01(a)(1).  Financial statements filed
with the SEC which are not prepared in accordance with GAAP "will be presumed to be
misleading or inaccurate, despite footnote or other disclosures, unless the Commission has
otherwise provided."  17 C.F.R. § 210.4-01(a)(1).

44.  GAAP includes the following principles, among others, which were violated
by defendants as described below:

    a.    the principle that a conservative approach be taken providing early recognition of unfavorable events and minimizing the amount of income reported.  (See Statement No. 4 of the Accounting Principles Board ("APB Nos") at 4 ¶¶ 28, 35, 171);

    b.    the principle that the financial information presented should be complete.  (See APB No. 4, ¶¶ 28, 35, 88, 171);

    c.    the principle of fair presentation ("presents fairly").  (See APB No. 4, ¶¶ 109, 138, 189);

    d.    the principle of adequacy and fairness of disclosure.  (See APB No. 4, ¶¶ 81, 106, 189, 199);

    e.    the principle of materiality concerning information that is significant

enough to affect evaluations or decisions. (See APB No. 4, ¶¶ 25, 128);

f.    the principle that the substance of transactions rather than form should be reflected. (See APB No. 4, ¶¶ 25, 35, 127);

g.    the principles that informed judgment based on background and knowledge should be applied. (See APB No. 4, ¶¶ 25, 35, 124, 173, 174);

h.    the principle that items included in the financial statements be reliably corroborated by outside evidence (verifiability). (See APB No. 4, ¶¶ 23, 35, 90);

i.    the principle that the financial statements contain and disclose relevant, understandable, and timely information for the economic decisions of the user. (See APB No. 4, ¶¶ 23, 88, 89, 92);

j.    the principle that the financial statements provide reliable financial information about the enterprise for the economic decisions of the user. (See APB No. 4, ¶¶ 77, 78, 107, 108); and

k.    the principle that accounts receivable must be reported in the financial statements at net realizable value  (See, e.g., ARB-43, Chapter 3A; FASB No. 5, Accounting for Contingencies.)

l.    The realization principle requires generally that revenue be earned before it is recognized.  Under GAAP, revenue is recognized when the earnings process is complete and a true exchange has taken place (Statement of Financial Accounting Concepts ("FAC") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶¶ 83, 84). Paragraph 83(b) of FAC No. 5 states:

> Revenues are not recognized until earned.  An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.    [Footnote omitted.]

m.    Moreover, the earnings process is not complete until collection of the sales price is reasonably assured.  (Id.) As the Company has admitted, by virtue of the restatement of its financial statements for the first three quarters of fiscal year 2000, it recognized revenue in violation of GAAP.  According to the Company, such revenue should not have been recorded because the

16

earnings process was not complete.

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
### AND SEC RULE 10b-5 AS AGAINST ALL DEFENDANTS

45.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

46.  This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

47.  During the Class Period, defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase Brooktrout common stock during the Class Period at artificially inflated prices.

48.  During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

49.  Throughout the Class Period, Brooktrout acted through the Individual

Defendants, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Brooktrout, which is primarily liable for the securities law violations of the Individual Defendants while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

50. As a result of the dissemination of the false and misleading statements set forth above, the market price of Brooktrout common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing Brooktrout common stock. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

51. Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

52. By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of Brooktrout common stock during the Class Period.

18

## COUNT II

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST
### THE INDIVIDUAL DEFENDANTS

53.  Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

54.  The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

55.  The Individual Defendants had the power and influence and exercised the same to cause Brooktrout to engage in the illegal conduct and practices complained of herein.

56.  By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Brooktrout common stock during the Class Period.

**WHEREFORE**, plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

C.     Awarding plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, and experts;

D.   Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

E.   Granting such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial of all issues so triable.

Dated:  October 13 , 2000

BERMAN, DEVALERIO & PEASE LLP

Jeffrey C. Block, BBO #600747
Michael G. Lange, BBO #559372
Jennifer L. Finger, BBO #641830
One Liberty Square
Boston, MA 02109
(617) 542-8300

Charles J. Piven
Law Offices of Charles J. Piven, PA
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, MD  21202
(410) 332-0030

**Attorneys for Plaintiff**

## PLAINTIFF'S CERTIFICATION

_____*Jim  C .  Do*_____ _____ ("Plaintiff"), declares under penalty of

perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the

direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class,

including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in Brooktrout, Inc. securities during the Class Period are as

follows:

| # of Securities Purchased | # of Securities Sold | Price Per Share | Date |
|---|---|---|---|
| *175* | | *30.85* | *3/24/00* |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought

to serve or served as a representative party for a class under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on

behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as

ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

_*13*_ day of _*October*_ _____ 2000.